**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **QFS TRANSPORTATION, LLC** | : | |
| 11461 Northlake Boulevard | : | Case No. _____ |
| Cincinnati, OH 45249 | : | |
| | : | Judge _____ |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **INFINITY TRANSPORT SERVICES, INC.** | : | **COMPLAINT** |
| 1251 North Eddy Street | : | |
| South Bend, IN 46617 | : | |
| | : | |
| and | : | |
| | : | |
| **JOSEPH DIMPERIO** | : | |
| 1251 North Eddy Street | : | |
| South Bend, IN 46617 | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

_____

For its Complaint (the "Complaint") against Defendants Infinity Transport Services, Inc. ("Infinity") and Joseph Dimperio ("Dimperio"), Plaintiff QFS Transportation, LLC ("QFS") states as follows:

## Introduction

1.     This is an action for breach of contract against one of QFS's former intermodal shipping agents, Infinity, and Infinity's owner and primary principal, Dimperio.  Defendants breached their contractual obligations to QFS by failing to pay amounts owed to QFS, including liquidated damages related to their ongoing and willful violations of a restrictive covenant not to solicit QFS's customers.

2.     Until August 28, 2018, Infinity was a contracted agent that, under QFS's name and on QFS's behalf, developed business and provided intermodal freight brokerage services to customers in the Greater Chicago area.  Prior to working for QFS, Infinity and Dimperio executed an Agreement for Regional Business Development (the "Agreement"), pursuant to which they agreed, among other things, to reimburse and/or pay certain expenses that were prepaid by QFS during the parties' business  relationship and to be bound by certain restrictive covenants, including a covenant not to solicit QFS's customers for a period of three years following the Agreement's termination.  A copy of the Agreement is attached as Exhibit A. Dimperio jointly and severally guaranteed Infinity's performance of its obligations under the Agreement.

3.     Recently, Infinity terminated the Agreement and began working as an agent for one of QFS's direct competitors, Eagle Systems Inc. ("Eagle"), to provide services that are virtually identical to those that Infinity provided to QFS under the Agreement.  In the course of providing services to Eagle, Defendants have solicited customers of QFS in violation of the Agreement's restrictive covenants.  Furthermore, at the time the Agreement was terminated, Defendants owed QFS more than $163,000 in reimbursement of amounts prepaid by QFS during the parties' business relationship.

**Jurisdiction and Venue**

4.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

5.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

**The Parties**

6.      Plaintiff QFS is a Nevada limited liability company that is registered with the Ohio Secretary of State to conduct business in Ohio, and maintains its principal place of business at 11461 Northlake Boulevard, Cincinnati, Ohio 45249.  QFS is a federally registered freight broker that provides third-party logistics services throughout the United States.

7.      Defendant Infinity is an Indiana corporation that maintains its principal place of business at 1251 North Eddy Street, South Bend, Indiana 46617.  Infinity is registered to receive service of process through its Registered Agent, Dimperio, at the same address.

8.      Defendant Dimperio is an individual residing at 5102 S. Major Avenue, Chicago, Illinois 60638.  Dimperio is Infinity's President as well as its Registered Agent for service of process.

**The Facts**

A.      *The nature of QFS's business.*

9.      Together with its sister company, First Star Logistics, LLC, QFS operates as a third-party logistics company that brokers and/or transports freight in all 50 states and beyond. This work includes, without limitation, motor carrier brokerage, intermodal marketing, international air and ocean transportation, freight forwarding, and a broad array of other transportation needs.

10.     QFS regularly partners with independent contractors to expand its logistics and freight network to better serve its existing customers.  QFS engages independent contractors as agents to perform services for existing QFS customers in particular local markets and to develop additional business.

11.     These contractors, typically referred to as "agents," operate under the QFS name and hold themselves out to the public and to customers as being part of QFS, while providing services to existing QFS customers and developing new business.

12.     QFS assists its agents in building their networks and businesses in their geographical markets and often refers local business from its customers to its agents within the region where the services are required.  In other words, QFS regularly provides business for its agents.

13.     The third-party logistics industry (and the shipping industry at large) is extremely competitive.  As such, developing and maintaining relationships with agents, customers, and carriers are critical to achieving and maintaining success in the industry.

14.     QFS grants its agents access to certain types of confidential and proprietary information, including, without limitation, detailed customer lists and related information, proprietary company processes and techniques, and other sensitive, non-public information.

15.     Access to this information is essential for these agents to service QFS customers and to develop business in their local markets—both from QFS customers and other companies.

16.     QFS has spent a great deal of time, money, and other resources developing and maintaining this confidential and proprietary information, developing relationships with new customers, and strengthening relationships with existing ones.

17.     QFS has also expended significant resources (financial and otherwise) to develop its sales and marketing processes and training for its agents to best set them up for success.

18.     QFS has taken several steps to protect its relationships with current and prospective customers, as well as its confidential, proprietary, and trade secret information.  For instance, QFS maintains secure password controls on all its proprietary information and restricts

access, even among its agents, to registered users who must be vetted and approved by QFS before receiving access.

19.　　QFS requires its sales and trucking agents to sign agreements that contain non-competition, non-solicitation, and non-disclosure covenants.

B.　　*Infinity begins working as a QFS agent.*

20.　　On August 29, 2016, QFS executed the Agreement with Infinity and Dimperio.

21.　　Per its terms, the Agreement was initially effective from August 29, 2016 to August 29, 2017.　*See* Agreement § 11.　When neither party chose to terminate it, the Agreement automatically renewed for another year, through August 28, 2018.　*See id.*

22.　　Under the Agreement, Infinity became an independent contractor working exclusively for and under the banner of QFS.　*See id.* §§ 1, 3, 5B.

23.　　Dimperio signed the Agreement as the owner and principal of Infinity, and personally guaranteed the full performance of Infinity's obligations under the Agreement.　*See id.* § 1C.

24.　　Dimperio also agreed to jointly and severally guarantee Infinity's timely performance of its obligations under the Agreement.　*See id.*

25.　　After executing the Agreement, QFS provided Defendants, who were now working as agents of QFS, with access to certain confidential and proprietary information, including existing and prospective customer lists (with contact and other customer-specific information), sales processes, sales history, and company-specific procedures.

26.　　Further, QFS facilitated Defendants' access to and involvement with multiple existing QFS customers.　All of this was necessary to help Defendants successfully perform as QFS agents and to grow a significant book of business.

27. The Agreement contains the following confidentiality, non-competition, and non-solicitation protections for QFS:

> [Infinity] and [Dimperio] acknowledge and agree that information concerning [QFS's] computers, software and its Carrier Business (defined below) and all information provided by [QFS] is the **sole and separate proprietary and confidential information of [QFS]**, and the use of or access to such information does not give [Infinity] or [Dimperio] ownership rights whatsoever in such proprietary and confidential information. [QFS] may provide and tender certain loads and business to [Infinity] from Customers of [QFS], during the term of this agreement (hereinafter "Carrier Business"). **[Infinity] and [Dimperio] agree that for three year[s] after the termination of this agreement, they will not solicit, or handle (subject to the 15% penalty below) any of the Carrier Business from those customers.** Any business solicited and received directly by [Infinity] would not be part of the Carrier Business. **[Infinity] and or [Dimperio] will pay [QFS] as liquidated damages, 15% of any revenue on Carrier Business that it handled within the first 36 months after termination of this agreement.** Upon termination of this Agreement, [Infinity] and [Dimperio] shall immediately cease using such information.

Agreement § 6 (emphasis added).

28. In addition, neither Infinity nor Dimperio may, at any time while working for QFS or after the Agreement's termination, divulge or disclose any of QFS's confidential information to a third party. Infinity and Dimperio must also return all such information (and copies thereof) to QFS upon termination of the Agreement. *See id.* § 6.

29. These provisions are some of the safeguards that QFS has implemented to protect its confidential and proprietary information.

30. In addition to requiring all its agents to agree to similar restrictive covenants, QFS also limits the use and distribution of computer passwords that allow access to its database, which houses various types of confidential customer information.

31. QFS required Infinity to identify, and get QFS's approval for, any individuals or employees of Infinity who needed to access QFS's database.

32.     The Agreement states that Infinity "is required to **devote exclusive services to** [QFS] and shall not have the right to perform any services for any other Carrier at any time during the Term of this Agreement." *Id.* § 5B (emphasis in original).

C.     *Infinity begins considering working for Eagle and accrues debts to QFS.*

33.     The Agreement requires the parties to give each other at least 30 days' written notice of any intent to terminate. *See id.* § 10.  Otherwise, the Agreement automatically renews for successive one-year periods.

34.     In July 2018, without warning or notice to QFS, Infinity blocked a QFS representative's access to its facility and, prior to that, ceased communicating with QFS altogether.

35.     Around the same time, QFS learned that Infinity was negotiating with Eagle, one of QFS's direct competitors, to serve as an intermodal agent for Eagle and provide the same or substantially similar services to Eagle as it provided to QFS.

36.     QFS notified Defendants of its concerns by letter and e-mail on July 24, 2018. QFS also notified Defendants that they owed $92,611.70 to QFS for various prepaid expenses, bad receivables, and certain other costs and damages resulting from Defendants' actions or omissions in servicing QFS's customers.

37.     In response, Defendants confirmed that they would continue their business relationship with QFS, and stated that they were not pursuing a relationship with Eagle.

38.     Days later, and on a Saturday, Defendants sent notice to QFS that they did not intend to renew the Agreement after all and, thus, to terminate it as of the close of business on August 28, 2018.

39.     The Agreement terminated on August 28, 2018.   Prior to breaching the Agreement, on at least once occasion, Infinity damaged some of the goods to be transported for QFS customers and failed to notify QFS of any issue or potential exposure.  This resulted in the customer refusing to pay for the shipment and pursuing QFS for damages.

40.     By the time the Agreement terminated, the amount that Defendants owed QFS had grown to $163,307.73.   This amount represents various accounts payable deductions, uncollectable amounts from Infinity accounts, QFS's contractual share of Infinity's accounts receivable (as was previously reported by Infinity to QFS), negative trucks, pending claims, QFS's contractual share of new invoices, and QFS's contractual share of certain accounts.

41.     Defendants have not given any indication that they have any intention of paying the amount owed to QFS under the Agreement.

42.     Upon information and belief, Infinity is now operating and developing Eagle's trucking, intermodal, and/or transportation services business in the Chicago, Illinois area.

43.     Upon information and belief, Infinity has solicited and conducted business with QFS's current and former customers since it began working as Eagle's agent.

## CAUSE OF ACTION

### Breach of Contract

44.     QFS restates and realleges the preceding paragraphs of this Complaint by reference.

45.     The Agreement is a valid and legally enforceable contract that QFS, Infinity, and Dimperio entered into freely and without duress.

46.     In exchange for their commitment to be bound by the Agreement, Infinity and Dimperio received adequate and sufficient consideration, including compensation, training, and

access to QFS's confidential and proprietary information to aid their professional development and successful performance under the Agreement.

47.     The Agreement is both reasonable in scope and reasonably tailored to protect QFS's legitimate business interests.

48.     Prior to breaching the Agreement, on at least once occasion, Infinity damaged some of the goods to be transported for QFS customers and failed to notify QFS of any issue or potential exposure.  This resulted in the customer refusing to pay for the shipment and pursuing QFS for damages.

49.     Upon information and belief, Infinity and Dimperio have breached and continue to breach the Agreement by (a) soliciting and conducting business with QFS's customers on behalf of a QFS competitor, Eagle, prior to the expiration the Agreement's restrictive covenants, and (b) disclosing or misusing QFS's confidential and proprietary information for purposes prohibited by the Agreement.

50.     In addition, Infinity has breached the Agreement by failing to fulfill its obligations and timely pay amounts owed to QFS under the Agreement, which obligations and amounts Dimperio personally guaranteed.

51.     As a direct and proximate result of Defendants' breaches of the Agreement, QFS has suffered damages in an amount to be determined at trial, but which exceed $75,000.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against Defendants and award the following relief:

a)     Compensatory damages against Defendants, jointly and severally, in an amount to be proven at trial, plus costs and pre- and post-judgment interest; and

b)      Such other relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Ryan S. Lett*
Ryan S. Lett (0088381)
rlett@fbtlaw.com
FROST BROWN TODD LLC
3300 Great American Tower
301 East Fourth Street
Cincinnati, Ohio 45202
Phone: (513) 651-6800
Facsimile: (513) 651-6981

E. Todd Wilkowski (0069854)
twilkowski@fbtlaw.com
FROST BROWN TODD LLC
9277 Centre Pointe Drive, Suite 300
West Chester, Ohio 45069
Phone: (513) 870-8241
Facsimile: (513) 870-0999

**Trial Attorneys for Plaintiff**

C:\Users\sdr\AppData\Local\Microsoft\Windows\INetCache\Content.Outlook\8R52FWKG\QFS v. Infinity and Dimperio Complaint - 4848-9599-9601.1 4845-7546-5585 v.2 (002).docx